Robert S. SCHNEIDER, Appellant,

v.

Elmer F. KELM, (Formerly) Collector of
Internal Revenue (St. Paul, Minne-
sota), Appellee.

Adolph SCHEIN, Appellant,

v.

Elmer F. KELM, (Formerly) Collector of
Internal Revenue (St. Paul, Minne-
sota), Appellee.

Nos. 15580, 15581.

United States Court of Appeals
Eighth Circuit.

Oct. 30, 1956.

Harry L. Altman, Minneapolis, Minn., for appellants.

Louise Foster, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson, Robert N. Anderson and Walter R. Gelles, Attys., Dept. of Justice, Washington, D. C., and George E. MacKinnon, U. S. Atty., St. Paul, Minn., were on the brief), for appellee.

Before JOHNSEN, VAN OOSTER-HOUT and WHITTAKER, Circuit Judges.

WHITTAKER, Circuit Judge.

These are "family partnership" income tax cases, involving the legitimacy, for Federal income tax purposes, of a partnership, created in February, 1944, between husbands and wives.

For each of the years 1946 and 1947 appellant, Robert S. Schneider, and his wife, Bertha, and appellant, Adolph Schein, and his wife, Jennie, each filed individual Federal income tax returns reporting 25% of the net income from a partnership, engaged in manufacturing ladies' dresses in Minneapolis, known as Boulevard Frocks Co. The Commissioner, asserting that the partnership was not legitimate for Federal income tax purposes, attributed the income reported by the wives to their husbands, resulting in proposed deficiency assessments against the husbands and in overassessments against the wives. Each of the husbands filed a protest with the Commissioner, but therein proposed settlement of the controversy on the same basis as he had earlier settled a like controversy with the Commissioner, respecting the years 1944 and 1945, while pending in the Tax Court. That basis was to apply the wife's refund upon the husband's deficiency, and for the husband to pay, in cash, 50% of the excess of the proposed deficiency assessments against him over the resulting overassessments against his wife. The Commissioner agreed to the proposed settlements, and, accordingly, on November 30, 1950, the husbands each executed a document (Treasury Form 870), consenting to the assessment against them of, and agreeing to pay, a deficiency, computed on the settlement basis stated, and, on the same day, the wives each executed a document (Treasury Form 873), agreeing to the proposed overassessments against them and that the refunds resulting to them were to be applied toward payment of the amounts agreed to be paid by their respective husbands, and that they would not file any claim for refund of income taxes for those years. On the same day the husbands each paid to appellee the balance of the amounts of the settlements.

In reliance upon the settlements, the Commissioner took no further action, and the statute of limitations barred

any further assessment against the husbands, in respect of the year 1946, on March 15, 1952, and in respect of the year 1947, on March 15, 1953, and barred any claim for refund by the husbands after two years from the date of the settlements on November 30, 1950.

Becoming dissatisfied with the settlements, and understanding that the Treasury Department Form 870 which they had signed was not a bilateral or enforceable contract of settlement, nor a final closing agreement under Section 3760 of the Internal Revenue Code, 26 U.S.C.A. § 3760, the husbands each filed, on November 26, 1952—and, therefore, within two years from the date of their payments, but after the Commissioner was barred from making any further assessment against them in respect of the year 1946—claims for refund of the deficiencies so paid, in which they each recognized that their claims, if successful, would result in deficiencies against their respective wives. Those claims were disallowed by the Commissioner, and soon afterward these suits, to recover the sums paid by, and credited to, the husbands on the settlements mentioned, were instituted in the District Court.

The suits were consolidated for trial and tried before the Court without a jury. The principal question involved at the trial was whether the partnership was legitimately created in good faith and for a sound business purpose. After hearing the voluminous evidence adduced, the Court concluded that it was not, and made findings of fact accordingly and entered judgment of dismissal upon the merits in each case, and the husbands, separately, have appealed to this Court.

Because appellants contend that the trial Court's findings are not supported by any substantial evidence and are "clearly erroneous", it is necessary for us to summarize the relevant evidence in some detail.

The evidence disclosed that in 1918 appellant, Schein, and others, created Boulevard Frocks, Inc., a Minnesota corporation, to engage in manufacturing and selling ladies' dresses; that in 1928 appellant, Schneider, purchased 20% of the outstanding stock of the corporation for $15,000. He had half of the money, and the other half was advanced to him as a loan by his wife's father. He repaid three-fourths of the loan, and the remaining one-fourth was forgiven; that in 1937 other stockholders retired from the business and Schein and Schneider acquired their stock, so that, thereupon, each owned one half of the outstanding stock of the corporation, or 342 shares;

That in 1943 the corporation was "in a bad excess profits tax position due to low base period earnings", and, because of its comparatively large surplus and the desire of Schein and Schneider to accumulate and retain a still larger surplus as a "cushion", the corporation faced undistributed profits taxes or penalties;

That in November, 1943, Schneider told Schein that he proposed to make a gift of one half of his stock in the corporation to his wife, and Schein testified: "I felt that as long as he was going to make a gift to his wife, I, in turn, would do the same thing * * * I didn't want to discredit against Mrs. Schein, I said I will make the same decision as long as you want to make the decision. I will give Mrs. Schein one half of my stock", and, thereupon, and on the same day, without communicating with the wives, both Schneider and Schein transferred one half their stock in the corporation, or 171 shares, to their respective wives; that the certificates to the wives were placed and retained in the company's office safe; that the value of each gift was about $30,000, and that gift tax returns were filed but they involved no tax. Schneider testified that his reasons for the gift to his wife were that her father had loaned half of his original investment and had forgiven part of it, and she had rendered services to him in the nature of counsel and advice, and, he felt, she was entitled to the security that the gift would give

her. Schein testified: "Our reasons as I stated before were that we felt that the women were entitled to one-fourth of the stock at that time and as long as Mr. Schneider had made up his mind, I followed suit";

That a little over two months later, in February, 1944, the corporation, though not dissolved, was liquidated by the transfer of all its assets to Adolph Schein, Jennie Schein, Robert S. Schneider and Bertha L. Schneider, who assumed its liabilities, and, thereupon, under the same date, the four parties signed a partnership agreement to carry on the same business at the same place, with the same assets, as equal partners, and providing that Adolph Schein and Robert S. Schneider "shall devote their full time to the conduct of the business of the partnership, having and being responsible for the same duties as they were authorized and bound to discharge in said liquidated corporation", for which they were to be paid salaries (and they were paid salaries of $15,000 per annum for a term, and later at the rate of $20,000 per annum), but the wives were only to "devote to the business so much of their time as shall be advantageous and expedient in the judgment of the partners", and were not to be paid any salaries.

Schneider testified that he had thought about liquidating the corporation and forming a partnership for some time, but could not state the exact length of the period, but he denied that he was thinking of forming a partnership when he gave the stock to his wife. Jennie Schein testified that the matter of creating a partnership came up at the time of the gifts of the stock.

Schneider testified that the reasons for liquidating the corporation and forming a partnership were that "we felt that our wives would take more interest in the business as partners", and that inasmuch as it was frequently necessary for both Mr. Schein and Mr. Schneider to be absent "we felt that the wives would sign checks while we were gone",

and he said, "Furthermore, we were in a low bracket due to excess profits tax at the time, and we felt that we couldn't keep sufficient money on that basis to take care of us in case of an emergency, and we felt that as a partnership we would be taxed the one time, whereas the other way, the corporation could be losing money and we, as individuals, would be paying income tax on what we drew as salary." As noted, the wives drew no salaries. Mr. Schein testified that "Mr. Schneider and I decided to change from a corporation to a partnership and we later communicated this decision to Mrs. Schein and Mrs. Schneider." Mrs. Schneider testified that she consulted her brother and brother-in-law, who were lawyers, before liquidating the corporation and going into the partnership, and they advised her the partnership would be a good "investment."

Neither of the wives at any time contributed any new money or property to the partnership. They each testified that they rendered services to the partnership, consisting of looking for new ideas and designs in women's dresses in various show windows and stores in Minneapolis, and also in New York, Chicago, Los Angeles and elsewhere, when accompanying their husbands to those cities on buying trips, and that they communicated their discoveries to their husbands and to the company's designers, and occasionally bought dresses for copying by the company's designers, and made suggestions about, and "criticized", the company's designs, and, when both Mr. Schein and Mr. Schneider were away, they, occasionally, when called for the purpose, went to the partnership's office and signed payroll checks. But appellee called as witnesses the person who had been the designer for the business for 13 years, including the partnership period, and the sample maker who had been with the business for 19 years, including the partnership period, and the person who made the final patterns for the business for many years, including the part-

nership period, and, though friendly to petitioners, they each testified that neither Mrs. Schein nor Mrs. Schneider ever communicated any ideas, designs or dresses, for use or copying in the business. The designer said that while she had seen Mrs. Schein and Mrs. Schneider at the plant, they were not there on business and never discussed business, but talked about personal belongings. The sample maker testified that she never saw any design, pattern or dress made or brought in by either Mrs. Schein or Mrs. Schneider. The pattern maker testified that she only knew Mrs. Schein from having seen her in Court and had never seen Mrs. Schneider.

In the main, the wives permitted their purported shares in the profits of the partnership to remain and accumulate in the partnership, withdrawing—and depositing in joint accounts with their husbands—only enough to pay income taxes on their purported partnership profits and to purchase some bonds, principally in the joint names of themselves and their husbands, and, in Bertha Schneider's case, withdrawing comparatively small amounts to purchase a few luxuries that she didn't want her husband to know about.

Appellee offered evidence that, after the gifts of stock, Mr. Schein and Mr. Schneider signed, on December 27, 1943, a "Call and Waiver of Notice of Annual Meeting" of the corporation, saying that they were "all of the shareholders of Boulevard Frocks, Inc.", and appellee also offered evidence showing that in 1946 appellants made a collective bargaining contract in the name of the corporation, "Boulevard Frocks, Inc.", with the union representing plant employees.

In 1948 there were disagreements between Schein and Schneider and Mr. Schein bought the Schneiders' interests, and, soon afterward, dissolved the partnership and caused its assets to be transferred back to the old corporation, Boulevard Frocks, Inc., because, as he said, the new community property law obviated any further need for a partnership.

This is a fair summary of the relevant evidence.

At the conclusion of the evidence the Court remarked that he did not believe the Scheins were creditable witnesses, but that he did attach weight to Mr. Schneider's testimony, but was of the view that their situations were not legally different "because it was all one great big deal between the four of them, and I am satisfied that this was a fictitious partnership solely for the purpose of taking tax advantage of it."

Later the Court prepared an opinion, 137 F.Supp. 871, and made formal findings of fact, finding, in essence, that control of the gift stock actually remained in appellants; that the motive for transferring the corporate assets to the partnership was tax evasion; that after the transfer, appellants still retained control over the purported partnership interests of their wives; that there was no *bona fide* intent to operate the business with the wives as partners; that the intent was that the partnership be operated with the capital of appellants and with the services of appellants and of paid employees; that neither of the wives contributed any capital originating with them, and neither rendered any services of significance, nor did they earn any part of the partnership income, and that the purpose of the plan of appellants and their wives was tax evasion and they followed a joint and predetermined course of action in its consummation.

■ Contrary to appellants' contentions, we think it is clear that the evidence, above summarized, and the inferences properly to be drawn therefrom by the trial Court amply support the Court's findings. And if those findings are to stand, it follows, under the long established and familiar principles, governing such cases, announced by the Supreme Court in Tower v. Commissioner, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed.

670, and Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, and reiterated in many cases by this Court, Kohl v. Commissioner, 8 Cir., 170 F.2d 531; Nelson v. Commissioner, 8 Cir., 184 F.2d 649; Kasper v. Barron, 8 Cir., 207 F.2d 744; Scott v. Self, 8 Cir., 208 F.2d 125, and Lannan v. Kelm, 8 Cir., 221 F.2d 725, that they adequately support the judgments and they should be affirmed.

■ But appellants contend that even if it be held that there was evidence to support the findings, they, nevertheless, were "clearly erroneous" within the meaning of Rule 52(a) of Fed.Rules Civ.Proc., 28 U.S.C.A. because as they argue, they are against the weight of the evidence, and that we are free to, and should, set them aside and make our own findings to the contrary.

It is true that the Supreme Court, in United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, said: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." But we have reviewed the entire evidence in these cases and are not left with any definite and firm conviction that a mistake has been committed. Rather, our conviction is the other way, and, hence, we cannot say that any of the findings are clearly erroneous, and, therefore, the findings must stand as against the attack on that ground.

Appellants take up each of the findings, *seriatim*, and argue that they are against the weight of the evidence, and that we are free to, and should, reverse the findings of the trial court in each instance and make exactly the opposite findings.

■ "The appellants have misconceived the functions of this Court, the jurisdiction of which is appellate. In the case of Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417–418,

150 A.L.R. 1056, we said: '* * * This Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398. The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701 (affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251); Travelers Mutual Casualty Co. v. Rector, supra. In a nonjury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F. 2d 1, 4, 5; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, supra.'

■ "* * * Whether a reviewing court thinks that it would or might have made different findings of fact or have entered a different judgment, had it been the trier of the facts, is a matter of no consequence. On review, this Court should refrain from exercising any of the trial functions conferred by law upon the district courts." Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137, 138.

It is clear that the findings are not, on this appellate review, vulnerable to the attack that they are against the weight of the evidence.

■ Appellant Schneider argues that because the trial Court said, at the conclusion of the trial, that he attached weight to Mr. Schneider's testimony, it follows that the trial Court believed all that he said, including his statements that his motives and intentions, in mak-

ing the gift of stock to his wife, and in creating the partnership, were in all respects *bona fide*, and not for income tax evasion purposes, and that he thus stands on different ground than appellant, Schein, and that the findings should, at least, be accordingly reversed as to him. There is no merit in this position. The findings, which speak for themselves, are to the contrary and apply alike to both appellants and find, with ample evidentiary support, that they followed a joint and predetermined course.

■ Appellant Schein argues that his wife, who was emotionally unstable and under a doctor's care, and who gave some testimony which he regards as damaging to him while a witness called by appellee, was so mentally incompetent that she should not have been allowed to testify. A letter, prepared by her physician, and handed by appellant Schein's counsel to the Court, said that she was suffering from a chronic tension state and that, should she be required as a witness, some consideration should be given to that condition, and that prolonged exposure to courtroom conditions should be avoided. No one objected to her competency as a witness in the trial Court, and the letter referred to does not indicate that she was incompetent to testify, but, rather, the contrary. At all events this was a matter within the sound discretion of the trial Court, and that discretion is not shown to have been abused.

The result is that there was substantial evidence to support the findings of the trial Court, and those findings are not clearly erroneous and must stand, and they support the judgment in each case, and those judgments must therefore be affirmed.

This disposition renders unnecessary any discussion or decision of the equitable estoppel defenses asserted by appellee, and sustained, as to the year 1946, by the trial Court based upon the effect of the settlements made in November, 1950.

Affirmed.